Filed 10/26/20  P. v. Berg CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>LEE BERG,<br><br>    Defendant and Appellant. | B295556<br><br>(Los Angeles County<br>Super. Ct. No. LA019703) |

APPEAL from an order of the Superior Court of Los Angeles County, William C. Ryan, Judge.  Affirmed.

Michael S. Romano, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and J. Michael Lehmann, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

# I. INTRODUCTION

In 1995, defendant and appellant Lee Berg was convicted of second degree burglary and petty theft with a prior. As a third strike offender, he was sentenced to 25 years to life in prison. In 2015, Berg filed a Proposition 47 petition for resentencing (Pen. Code, § 1170.18),[1] arguing he was suitable for resentencing because he did not pose an unreasonable risk of committing certain violent felonies known as "super strike" offenses. Berg now appeals the denial of his petition, arguing the order should be reversed because: (1) the People failed to plead specific facts in their opposition; (2) the trial court applied the wrong evidentiary standard; and (3) the court misinterpreted the record in reaching its determination of dangerousness. We conclude the trial court did not abuse its discretion in denying the petition and affirm the order.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. Criminal History and Commitment Offense

Berg (born in 1959) committed theft and drug-related offenses through most of his adult life:

- In 1978, he was convicted of disrupting school activities, misdemeanor grand theft, and petty theft.
- In 1979, he was convicted of misdemeanor trespass.
- In 1980, he was convicted of felony burglary, petty theft with a prior, and unlawful taking of a vehicle, driving erratically under the influence of drugs and alcohol, crashing into two cars, and injuring a person.
- In 1982, he was twice convicted of petty theft with a prior.

---

[1] Further unspecified statutory references are to the Penal Code.

2

- In 1983, he was convicted of first degree burglary, a qualifying strike, and sentenced to two years in prison. While under the influence of drugs, he gained entry to a residence by breaking a window, taking a bicycle and a knife.
- In 1985, he was convicted of unlawful taking of a vehicle and sentenced to 16 months in prison. He violated parole in 1986 and returned to prison.
- In 1987, he was convicted of attempted first degree burglary, a qualifying second strike, and sentenced to three years in prison. Berg tried to break in to a residence through a window while under the influence of alcohol. He violated parole in 1989 and returned to prison.
- In 1990, he was convicted of being under the influence of a controlled substance.
- Also in 1990, he was convicted of grand theft. He was under the influence of cocaine at the time of the crime, and sentenced to four years in prison. He violated parole in 1993 and returned to prison.
- In 1993, he was convicted of petty theft with a prior and sentenced to two years and four months in prison.

The commitment offense occurred in 1995. Berg entered a supermarket and concealed three bottles of liquor under his jacket. When employees confronted Berg after he left the store, Berg fought with them and had to be taken into custody by force. Berg was under the influence of heroin at the time. A jury convicted him of second degree burglary (§ 459) and petty theft with a prior (§ 666). The trial court found true the allegations that he suffered two prior felony convictions for burglary and attempted burglary within the meaning of the Three Strikes Law

3

(§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)).  The court imposed a third strike term of 25 years to life for the burglary count, and stayed punishment for the petty theft conviction pursuant to section 654.

In 2009, while incarcerated, Berg was convicted of unlawful possession of a manufactured weapon, and sentenced to a consecutive six-year term.

## B.      Disciplinary Record During Incarceration

During his incarceration, Berg was found guilty of 16 California Department of Corrections and Rehabilitation (CDCR) serious rule violations.

- In 1996, he committed battery on an inmate and was observed punching his cellmate, who did not fight back.
- In 1999, he participated in a melee and was an active participant in a race riot.  The same year, he committed battery on a peace officer.
- In 2000, he engaged in mutual combat with his cellmate, slamming him to the ground.
- In 2007, he was an active participant in a violent race riot.  Also in 2007, he delayed a peace officer.
- In 2008, he possessed a manufactured weapon.  The same year, he delayed a peace officer.
- In 2009, he committed theft of food.
- Also in 2009, he committed battery on an inmate with a weapon (presumably, a razor blade).  Berg chased the inmate and struck him with his fist until he fell down, then jumped on top of the inmate and continued to strike him until he was bloody, even as the inmate tried to run away.  The inmate sustained stab wounds that required medical attention.  Berg was subdued with pepper spray.

4

- Also in 2009, he was found guilty of possessing a controlled substance for distribution, after three plastic bindles containing 2.35 grams of heroin and gang-related messages were forced to be discharged from Berg's bowels.
- In 2011, he willfully obstructed a peace officer and went on a hunger strike.
- In 2012, he possessed manufactured alcohol.
- In 2015, he committed battery on an inmate with a knife-like weapon, striking him in the head and torso. The inmate sustained stab and slash wounds in his neck, back, and arm, requiring medical attention. Berg was subdued with pepper spray.
- Lastly, in 2015, he engaged in fighting with his cellmate, who suffered minor injuries.

## C.     Proposition 36 Petition and Previous Appeal

In 2013, Berg filed a petition for resentencing under Proposition 36 (§ 1170.126). The trial court denied the petition, finding Berg posed an unreasonable risk of danger to public safety. Berg appealed the order, arguing in part that newly enacted Proposition 47's definition of "unreasonable risk of danger to public safety" applied to dangerousness determinations under Proposition 36, and that under any standard, he did not pose an unreasonable risk of danger to public safety. We affirmed the order, concluding that Proposition 47's definition of "unreasonable risk of danger to public safety" did not apply to Proposition 36,[2] and the trial court did not abuse its discretion in

---

[2]     Our Supreme Court subsequently reached the same conclusion in *People v. Valencia* (2017) 3 Cal.5th 347, 375 (*Valencia*).

denying the Proposition 36 petition. (See *People v. Berg* (Sep. 12, 2016, B264001) [nonpub. opn.], review granted Nov. 30, 2016, review dismissed, cause remanded Nov. 29, 2017, S237997).)[3] We quote relevant portions of the opinion below:[4]

"Petitioner acknowledges that he was found guilty of serious rule violations in prison for 'acts of violence,' but argues that he 'was following the orders of powerful white inmates who threatened [his] personal safety if he failed to comply.' He further contends that his expert witnesses, [Richard] Subia[, a prison practices expert,] and Dr. [Hy] Malinek, [a clinical and forensic psychologist,] both concluded that he did not pose an unreasonable risk of danger to public safety."

"Although Subia testified that petitioner told him he was threatened by 'influential' inmates who asked him to commit these actions and that Subia found this explanation believable, it was within the trial court's discretion to disbelieve petitioner's account of events. . . . Even if the trial court believed that petitioner was influenced by powerful inmates who ordered him to commit these actions, Subia also testified that petitioner always had the option of seeking the protection of prison authorities.

"Furthermore, although petitioner's experts, Subia and Dr. Malinek, opined that petitioner did not pose an unreasonable risk of danger to public safety, Dr. Malinek also provided evidence that petitioner's actuarial tests indicated that the risk

---

[3]    We take judicial notice of our unpublished opinion in this matter. (Evid. Code, §§ 459, subd. (a), 452, subd. (d).)

[4]    Section headings in the unpublished opinion have been omitted.

he would engage in violence was moderate to high.  Given petitioner's violent conduct in prison and expert evidence that there was a moderate to high risk he would engage in future acts of violence, the trial court did not abuse its discretion in concluding that he posed an unreasonable risk of danger to public safety within the meaning of Proposition 36." (*People v. Berg, supra*, B264001, rev. gr.)

## D.    Proposition 47 Petition

In May 2015, Berg filed a Proposition 47 petition to recall his sentence, on the ground that his conviction on petty theft with a prior was now a misdemeanor, and he was suitable for resentencing because he did not pose a risk to public safety within the meaning of section 1170.18, subdivision (b).

The People filed an opposition, incorporating all prior evidence, arguments, and briefs filed in connection with the Proposition 36 petition.  Based on these materials, the People argued Berg was unsuitable for resentencing because he posed an "unreasonable risk of danger to public safety," which the statute defined as an unreasonable risk that he would commit a "new violent felony" within the meaning of section 667, subdivision (e)(2)(C)(iv).  (See § 1170.18, subd. (c).)  Among the violent felonies enumerated in subdivision (e)(2)(C)(iv)[5] is "[a]ny serious or violent felony offense punishable in California by life imprisonment or death." (§ 667, subd. (e)(2)(C)(iv)(VIII).)  The People argued that because a third strike offender who has committed two or more serious and/or violent felonies faces a life

---

[5]    These violent felony offenses are commonly known as "super strikes."  (See *People v. Hall* (2016) 247 Cal.App.4th 1255, 1262, fn. 6 (*Hall*).)

7

sentence on the subsequent serious and/or violent felony, he automatically poses an unreasonable risk of danger to public safety.

In reply, Berg argued that trial courts have discretion to strike a prior strike, so a third serious and/or violent felony that is not punishable on its own by a life sentence does not automatically qualify as a "new violent felony within the meaning of" section 667, subdivision (e)(2)(C)(iv). Berg further argued that he had never been convicted of a violent crime, let alone a "super strike," he was unlikely to escalate to more violent crimes because of his age, and his rehabilitation efforts and reentry plans eliminated any risk of danger to public safety.

## E.    Suitability Hearing

At the September 2018 suitability hearing, Richard Subia and Dayle Carlson testified as Berg's expert witnesses. The People did not call any witnesses but submitted into evidence exhibits of Berg's criminal history, CDCR disciplinary record, and rules violation reports.

### 1.    *Subia's Testimony*

Subia opined as follows: based on Berg's age and physical condition, the lack of violence in his criminal convictions, and the environmental differences between prison and the community, it was unlikely he would resort to past criminal behavior upon his release. An inmate of Berg's small physical stature, age, and drug habits would easily be targeted by other inmates, and Berg's many disciplinary violations were a necessary "survival mechanism." Berg could have, but did not, seek the help of prison authorities, likely because of the threat of being labeled an "informant." Although Berg was a suspected, "non-validated" gang member, Subia did not believe he was involved in any gang

activity. Berg had not committed a drug violation since 2009, and had been making an effort to attend substance addiction classes since 2013. However, Berg posed some risk of danger to the community, especially if his drug addiction was not addressed. Berg had a positive employment history, but the rehabilitative programming available to him in prison was limited, and he had a weak support network outside of prison. In Berg's own words, "[t]he pattern was always the same": he would be arrested, "clean up while in jail" until his release, and "the cycle would begin again."

### 2. *Carlson's Testimony*

Carlson, a risk assessment and reentry expert, opined as follows: Berg posed no risk of committing a "violent offense" or "super strike" in the community because his commitment offense was a "low-level felony" and his criminal record involved no violence. Berg's prior strike offenses, in 1983 and 1987, were remote in time, and his last conviction was in 2009. Carlson's risk assessment was based on Berg's "pre-incarceration conduct," but admittedly, that conduct included five incidents of driving under the influence of drugs or alcohol, which was potentially "extremely dangerous" and "could have killed somebody." Various risk assessment tests performed on Berg also indicated a moderate to high risk of future violence based on his violent conduct in prison. Berg had participated in 33 Narcotics Anonymous meetings in 2013 and 2014, and planned to enroll in the Amity Foundation, a long-term residential program offering "individual therapy, re-entry orientation support, drug treatment, vocational training, educational development, and work opportunities." However, he had only a "minimal record of treatment attempts" and no family members to support his

9

reentry.  Thus, Berg posed some risk of danger to the community if he resumed his drug use, and his successful reentry was "doubtful" without "substantial support."

## F.  Memorandum of Decision

In a 22-page memorandum of decision issued in November 2018, the court denied Berg's Proposition 47 petition.  As a preliminary matter, the trial court rejected the People's argument that Berg was unsuitable for resentencing because all third strike defendants are subject to a sentence of life imprisonment and thus automatically pose an unreasonable risk of danger to public safety.  The court explained that the "more logical interpretation of Proposition 47 is that the court may deny resentencing on unsuitability grounds only if the petitioner poses an unreasonable risk of committing one of the named 'super strike' offenses."  The court found Berg posed a risk of committing a "super strike" offense:

"[Berg] has an extensive criminal record, beginning in 1975 and continuing until the commitment offense.  While a history of recidivism alone is an insufficient basis for a court's finding that a petitioner poses an unreasonable risk of danger to public safety, the multiplicity of prior convictions and the failure to comply with conditions of intervening periods of probation or parole give rise to a valid concern about a danger to public safety.  (*In re Shaputis* (2008) 44 Cal.4th 1241, 1259.)"

"Therefore, the multiplicity of [Berg's] prior convictions and his inability to refrain from re-offending while in the community constitute present and relevant concerns only if other evidence in the record provides a nexus between [Berg's] criminal past and current dangerousness.  (Cf. *People v. Esparza* (2015) 242 Cal.App.4th 726, 746; *In re Lawrence* (2008) 44 Cal.4th 1181,

10

1227.)  While [Berg's] criminal history may be remote in time, there continues to be a nexus between his previous criminal history and his current risk of danger to public safety within the meaning of Proposition 47 because of his disciplinary history, elevated classification score, high CSRA score,[6] lack of rehabilitative programming, and insufficient parole plans."

"[Berg's] disciplinary history reflects a pattern of violent and aggressive conduct, evidencing his ability or unwillingness to comply with rules, respect authority, and refrain from fighting, almost 20 years into his current incarceration period.  Regardless of the remoteness of a petitioner's commitment offense, serious rule violations in prison constitute powerful evidence of an inmate's current willingness to engage in serious rule-breaking behavior and are probative of recidivist tendencies and the danger to public safety within the meaning of Proposition 47. (See *In re Rozzo* (2009) 172 Cal.App.4th 40, 60 [(*Rozzo*)]; *In re Bettencourt* (2007) 156 Cal.App.4th 780, 805.)"

While acknowledging that criminality declines with age, the court found those "statistics . . . are contradicted by [Berg's] disciplinary record, which shows incidents involving weapons and violence well into his forties and fifties."

The court also focused on Berg's CDCR Classification Score and CSRA score.[7]  His CDCR Classification Score as of May 2018

---

**6**     See part III.D.2, *post*, for a further discussion of Berg's California Static Risk Assessment (CSRA) score.

**7**     As the trial court explained, "[t]he CDCR Classification Score is a summary of an inmate's overall prison behavior which takes into account a broad variety of factors. . . .  Lower classification scores mean that lower security controls are needed

11

was 204, having steadily increased since he began his incarceration in 1995 with a score of 84. His CSRA score as of November 2017 was 4, out of a range from 1 to 5, indicating a high risk for non-violent offenses. The court pointed out that "[m]ost inmates who have petitioned for resentencing have a CSRA of 1."

The court also noted Berg's "sparse rehabilitative programming" in his 23 years of incarceration, and his failure to enroll in any anger management programming.

Finally, the court observed that Berg's postrelease plans were "tenuous" at best, because the length of the Amity Foundation program was unclear and Berg had no solid plans or support for reentry following the program. Thus, the court concluded based on the totality of the evidence that resentencing Berg posed an "unreasonable risk of danger to public safety."

Berg appealed the order.

---

. . . . The minimum score a life inmate can receive is 19," and points are added or deducted based on disciplinary violations and performance in work, school, or vocational training.

"The CSRA is a validated actuarial tool that utilizes demographic and criminal history data, which is used by the CDCR to predict an offender's risk of recidivating at the time they are released from CDCR. . . . The range is 1-Low, 2-Moderate, 3-High (Drug), 4-High (Property), 5-High (Violence)." The CSRA considers various factors such as age at release, number of total and violent felony convictions, number of drug and non-violent property offenses, number of weapons offenses, and alcohol-related offenses.

## III. DISCUSSION

Berg contends that the order denying the Proposition 47 petition should be reversed on three grounds: (1) the People never alleged in their opposition that Berg posed a risk of committing a "super strike" and therefore necessarily failed to meet their burden of proof; (2) the trial court abused its discretion by rejecting the applicable "preponderance of the evidence" standard of proof; and (3) the trial court misinterpreted the record in concluding that Berg posed a risk of danger to public safety. We disagree and affirm the order.

### A.     Proposition 47 and Standard of Review

"Proposition 47 reclassified as misdemeanors certain drug- and theft-related offenses that previously were felonies or wobblers," including petty theft with a prior theft-related conviction in violation of section 666. (*Valencia, supra*, 3 Cal.5th at p. 355; see § 1170.18, subd. (a).) "Proposition 47 also added a provision allowing felony offenders 'serving a sentence for a conviction' for offenses now reclassified as misdemeanors to petition to have their sentences recalled and to be resentenced" if they met certain criteria, " 'unless the court, in its discretion, determines that resentencing the petitioner would pose an unreasonable risk of danger to public safety.' " (*Valencia*, at p. 355; § 1170.18, subd. (a), (b).)

In contrast to Proposition 36, which does not define the term "unreasonable risk of danger to public safety," Proposition 47 provides that " 'unreasonable risk of danger to public safety' means an unreasonable risk that the petitioner will commit a new violent felony within the meaning of [section 667, subd. (e)(2)(C)(iv)]." (§ 1170.18, subd. (c).) Those violent felony offenses, commonly known as "super strikes," include sexually

13

violent offenses, homicide or attempted homicide, solicitation to commit murder, assault with a machine gun on a peace officer or firefighter, possession of a weapon of mass destruction, and "[a]ny serious or violent felony offense punishable in California by life imprisonment or death."[8]  (See *Hall*, *supra*, 247 Cal.App.4th at p. 1262, fn. 6; § 667, subd. (e)(2)(C)(iv)(VIII).) Thus, Proposition 47 limits the trial court's discretion to deny resentencing by narrowly defining the phrase "unreasonable risk of danger to public safety" to mean an unreasonable risk that the petitioner will commit a "super strike."  (*Valencia*, *supra*, 3 Cal.5th at pp. 355–356, quoting § 1170.18, subd. (c).)  The People have the burden of proving dangerousness by a preponderance of the evidence.  (*People v. Frierson* (2017) 4 Cal.5th 225, 239 (*Frierson*).)

In exercising its discretion to determine whether resentencing the petitioner would pose an unreasonable risk of danger to public safety, "the resentencing court may consider: (1) the petitioner's 'criminal conviction history, including the type of crimes committed, the extent of injury to victims, the length of prior prison commitments, and the remoteness of the crimes'; (2) his or her 'disciplinary record and record of rehabilitation while incarcerated'; and (3) '[a]ny other evidence' the court deems relevant."  (*Valencia*, *supra*, 3 Cal.5th at p. 355, quoting

---

[8]     Among the offenses that would satisfy this final category, i.e., offenses punishable by life imprisonment or death, are gross vehicular manslaughter with a prior (§ 191.5, subd. (d)), aggravated mayhem (§ 205), torture (§ 206.1), and aggravated assault during the commission of a residential burglary (§ 220, subd. (b)).

§ 1170.18, subd. (b)(1)–(3); accord, *People v. DeHoyos* (2018) 4 Cal.5th 594, 598–599.)

We review the court's decision that a petitioner poses an unreasonable risk of danger to public safety under the abuse of discretion standard (*People v. Losa* (2014) 232 Cal.App.4th 789, 791), and the facts and evidence upon which the trial court based its decision for substantial evidence. (*Frierson*, *supra*, 5 Cal.5th at p. 239.)

**B.    The Trial Court Correctly Determined That "Unreasonable Risk of Danger to Public Safety" Refers to the Danger of Committing a "Super Strike," and the People Were Not Required to Plead Specific Facts in Their Opposition.**

According to Berg, the People urged the court to apply the incorrect legal standard in ruling on the Proposition 47 petition because they mistakenly argued in their opposition that they only needed to prove Berg was likely to commit a serious or violent felony, rather than a "super strike." Berg asserts that because the People "pled [their] case under the wrong standard, [they] necessarily failed to [provide] evidence necessary to find Mr. Berg unsuitable for relief, failed to give notice as to which 'super strike' offense or offenses it was alleged he might commit, and failed to meet [their] burden of proof." As we discuss, the People's error was harmless because the trial court expressly rejected their argument and applied the correct legal standard, and further, the People's misstatement of the legal standard does not summarily establish their failure to meet their burden of proof.

Section 1170.18 contains no requirement that in opposing a Proposition 47 petition, the People must specifically plead that the petitioner poses an unreasonable risk of committing a "super

15

strike" offense.  (See § 1170.18.)  In interpreting analogous provisions of Proposition 36 that apply to petitions for resentencing, courts have concluded that the People are not required to specifically plead any disqualifying factors in opposing the petition.  (See, e.g., *People v. Guilford* (2014) 228 Cal.App.4th 651, 657; *People v. Chubbuck* (2014) 231 Cal.App.4th 737, 745.)  We reach the same conclusion here.

In opposing a Proposition 47 petition, the People have the burden of proving by a preponderance of the evidence that resentencing the petitioner would pose an unreasonable risk of danger to public safety.  (*Frierson*, *supra*, 4 Cal.5th at p. 239 ["several Courts of Appeal have properly concluded that '[t]he facts upon which the court's finding of unreasonable risk is based must be proven by the People by a preponderance of the evidence' "]; see *People v. Jefferson* (2016) 1 Cal.App.5th 235, 241 ["the proper standard of proof on a dangerousness finding is the default standard of proof by a preponderance of the evidence"].)

As the statute makes clear, it is up to the trial court to decide, based on all the evidence presented, whether resentencing would pose an "unreasonable risk of danger to public safety" because of the risk that the petitioner will commit a "super strike."  (See § 1170.18, subds. (b)–(c).)  As both parties acknowledge, the trial court made that determination under the correct legal standard when it expressly rejected the People's proposed definition of dangerousness and explained that the "more logical interpretation of Proposition 47 is that the court may deny resentencing on unsuitability grounds only if the petitioner poses an unreasonable risk of committing one of the named 'super strike' offenses."

Moreover, the People's failure to specifically allege in their opposition that Berg posed a risk of committing a "super strike" does not compel the conclusion that the People failed to meet their burden of proof by establishing such a risk. As we discuss more fully below (see part III.D., *post*), in opposing the petition, the People submitted ample evidence that Berg was unsuitable for resentencing because of the risk he presented of committing a "super strike," as demonstrated by his significant criminal history and disciplinary record involving multiple acts of violence, elevated classification and risk assessment scores, minimal rehabilitation efforts, and tenuous reentry plans. Nor does Proposition 47 require, as Berg contends, that the People provide "notice" to the petitioner as to which "super strike" they allege he was likely to commit. (See § 1170.18.)

Nevertheless, Berg contends that the trial court's ruling that he was likely to commit a "super strike" was a "ruling in error" because "a court may not adopt an argument or position that a party did not advance itself." He cites a recent United States Supreme Court case, *United States v. Sineneng-Smith* for this proposition. There, the Supreme Court explained the principle of "party presentation": " 'in both civil and criminal cases, in the first instance and on appeal . . . , we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present.' [Citation.]" (*United States v. Sineneng-Smith* (2020) 140 S.Ct. 1575, 1579 (*Sineneng-Smith*).) The Court explained that courts should not " 'look[ ] for wrongs to right,' " and should " 'normally decide only questions presented by the parties.' " (*Ibid.*)

*Sineneng-Smith* is distinguishable from the present case. There, the Court explained that instead of adjudicating the case

17

presented by the parties, "the appeals court named three amici and invited them to brief and argue issues framed by the panel, including a question [the appellant] herself never raised." (*Sineneng-Smith*, *supra*, 140 S.Ct. at p. 1578)  In contrast, the trial court here did not reframe the legal issue, but rather adopted the definition of "unreasonable risk of danger to public safety" advanced by Berg.  We find no error in the trial court's ruling, expressly made under the correct legal standard, which found Berg unsuitable for resentencing because he posed an unreasonable risk of committing one of the enumerated "super strike" offenses.

## C.    The Trial Court Applied the Correct Standard of Proof.

Berg next contends that the trial court abused its discretion by applying the wrong standard of proof.  Specifically, he urges, the court should have reviewed the hearing evidence under the preponderance of the evidence standard, but instead applied an "unstated or dramatically reduced 'tends to show' standard."[9] The claim is without merit.

---

[9]    Berg's suggestion that the trial court rejected the preponderance of the evidence standard is without merit.  In full, the court said as follows:  "*In the related context of a petition for recall and resentencing under Proposition 36*, case law establishes the People are tasked with proving dangerousness by a preponderance of the evidence; however, the trial court need not itself find an unreasonable risk of danger by a preponderance of the evidence."  (Italics added.)

The court's statement is consistent with *People v. Buford* (2016) 4 Cal.App.5th 886, 899, in which the court held with respect to Proposition 36 as follows:  "[T]he People have the

18

In its 22-page decision, the trial court correctly noted the factors relevant to determining whether Berg posed an unreasonable risk of danger to public safety, and it discussed at some length the evidence relevant to those factors. The court then concluded that Berg's commitment offenses, violent disciplinary history in prison, and limited rehabilitative programing were "powerful evidence" that Berg was "*likely to commit a 'super strike.'*" (Italics added.)

" ' "Likely" means "probable" or . . . "more probable than not." ' " (*People v. Russell* (2005) 129 Cal.App.4th 776, 787.) A fact is proved by a preponderance of the evidence if it is more probable than not that the fact is true. (*Conservatorship of O.B.* (2020) 9 Cal.5th 989 [" 'more likely than not' standard" commonly referred to as a "preponderance of the evidence"]; *Masellis v. Law Office of Leslie F. Jensen* (2020) 50 Cal.App.5th 1077, 1093 ["[r]equiring proof that something is ' "more likely than not" ' is a preponderance of the evidence standard"].) The trial court's statement that it believed Berg "*is likely to commit* a 'super strike' " thus demonstrates that the court applied a

_____

burden of establishing, by a preponderance of the evidence, facts from which a determination resentencing the petitioner would pose an unreasonable risk of danger to public safety can reasonably be made . . . . The ultimate determination that resentencing would pose an unreasonable risk of danger is a discretionary one. While the determination must be supported by facts established by a preponderance, the trial court need not itself find an unreasonable risk of danger by a preponderance of the evidence." In any event, nothing in the trial court's order suggests it adopted *Buford*'s analysis; to the contrary, the order, considered as a whole, plainly demonstrates that the court applied a preponderance of the evidence standard.

19

preponderance of the evidence standard—the very standard Berg asserts should have been applied here.

Nor are we persuaded, as Berg suggests, that the trial court's use of the phrase "tends to show" means that the court applied a "dramatically reduced" standard of proof. The court said: "The court finds that the type of misconduct involved in [Berg's] record, paired with [Berg's] limited rehabilitative programing, *tends to show* that [Berg] is an unreasonable risk of danger to public safety pursuant to the narrow definition set forth in subdivision (c) of section 1170.18. *In other words,* [Berg's] violent disciplinary history . . . , limited rehabilitative programing, along with his extensive criminal history, show that [Berg] *is likely to commit a 'super strike.' "* (Italics added.) In short, the court's statement makes clear that the court understood "tends to show" to refer not to an "unstated" or "reduced" standard of proof, but rather to a preponderance of the evidence.

In any event, the decision, considered as a whole, demonstrates the court clearly found Berg presented an unreasonable risk of danger by a preponderance of the evidence. The court carefully examined the record and considered Berg's lengthy criminal history and disciplinary record, noting multiple and recent acts of violence. The court also highlighted deficiencies in Berg's rehabilitative efforts, his increased risk assessment scores, and uncertainties in his postrelease plans. On balance, the court also considered the testimonies of Subia and Carlson, who opined that certain factors mitigated Berg's risk of danger in the community: his age, the remoteness of his crimes, the lack of violence in his criminal record, his positive record of employment and rehabilitation, and the pressures

20

unique to a prison environment which do not exist in the community. The court weighed the totality of this evidence, concluding that the evidence of Berg's dangerousness was "powerful" and preponderant over evidence of his rehabilitation. Because the court determined that Berg posed an unreasonable risk of danger by a preponderance of the evidence, we cannot conclude the court rejected the applicable standard of proof.

**D.    The Trial Court Did Not Abuse Its Discretion in Denying Berg's Proposition 47 Petition Based on His Risk of Danger to Public Safety.**

Berg contends the trial court abused its discretion by misinterpreting the record pertaining to his criminal history and CSRA score, rehabilitation efforts, and reentry plans to conclude that Berg posed an unreasonable risk of danger to public safety. In particular, Berg argues that by misinterpreting the record, the trial court failed to establish "any connection or nexus between [Berg's] record and any one of the 'super strike' crimes" enumerated in section 667, subdivision (e)(2)(C)(iv). We conclude the trial court did not misinterpret the record, which amply supports the finding that Berg posed a risk of committing a "super strike."

**1.    *Berg's Criminal History and Disciplinary Record Amply Support the Trial Court's Finding That He Posed a Risk of Committing a "Super Strike."***

Under Proposition 47, the trial court's consideration of an inmate's criminal history takes into account, among other things, "the type of crimes committed, the extent of injury to victims, the length of prior prison commitments, and the remoteness of the crimes." (§ 1170.18, subd. (b)(1).) Although Berg minimizes the seriousness of his criminal history, and his experts emphasized

21

the absence of any violence, Berg was a third strike offender who had twice committed or attempted first degree residential burglary. Moreover, Berg's criminal history spanned three decades, included nine felony convictions, persisted well into his 40's and 50's, and involved incidents his own experts agreed were extremely dangerous to others, could result in someone's death, and would reasonably lead to an inference of future violence. For example, in 1980, he drove erratically while under the influence of drugs and alcohol, crashing into property and injuring a person. In 1983, he broke into a residence while under the influence of drugs and took possession of a knife. More recently, in 2009, Berg was convicted of possessing a manufactured weapon while in prison.

Further, as the trial court noted, while Berg's criminal history was remote in time, Berg's disciplinary record during incarceration is the most compelling evidence of his continuing propensity for violence, current dangerousness, and increased risk of committing a "super strike." An inmate's institutional misconduct "constitutes evidence of [his] willingness to engage in serious rule breaking behavior despite having received a substantial criminal sanction" and is probative of his risk of recidivism. (*Rozzo*, *supra*, 172 Cal.App.4th at p. 60; see § 1170.18, subd. (b)(2).) As of 2018, Berg had 16 serious rule violations, eight of which involved violence or dangerous weapons. He committed battery or engaged in violent fighting in 1996, 1999, 2000, 2009 and twice in 2015. Two recent incidents demonstrated Berg's willingness to use force to inflict great bodily injury, even after his victims no longer posed a threat. In 2009, Berg struck an inmate in the back and stabbed him with a razor blade, continuing to strike him as the inmate tried to run

away until blood streamed from his back and arm. The inmate suffered stab wounds that required medical attention. In 2015, Berg struck another inmate with a sharp, knife-like weapon in vulnerable body parts, including his head and torso, despite multiple orders from officers to stop fighting. The inmate sustained stab and slash wounds, including a puncture wound to his neck, which required medical attention. In both incidents, Berg had to be subdued with pepper spray, exhibiting an inability or unwillingness to control his violent impulses. Berg did not refrain from misconduct even after the passage of Proposition 36 and Proposition 47, committing his most violent offense after the filing of his Proposition 36 petition, when he knew his behavior during his incarceration would be under particular scrutiny.

Therefore, although Berg has never committed a disqualifying "super strike," his consistent pattern of violence, disregard for others' safety, and failure to comply with the terms of his parole and incarceration abundantly support the trial court's conclusion that he presented a risk for committing such an offense in the future. The trial court properly considered Berg's 30-year criminal history, nine felony convictions, multiple incidents of driving under the influence, and 16 serious rule violations while in prison, many involving deadly force or dangerous weapons. Thus, its conclusion that Berg posed an unreasonable risk of committing a "super strike" offense in the community was sufficiently supported by the record.

**2.** ***The Trial Court Did Not Misinterpret the***
***Record.***

**a.** **The Court Viewed Berg's CSRA**
**Score in the Context of Other Evidence.**

Berg asserts the trial court misunderstood the significance of Berg's CSRA score of 4, which, Berg says, means he is "not high risk to commit any violent crime within three years of release," and only indicates "an elevated risk of committing a nonviolent property crime." In fact, the court plainly explained in a footnote that a CSRA score of 4 indicates a high risk of committing a "property"-related crime, while a score of **5** indicates a high risk of committing a crime of "violence." We thus find no indication that the trial court misunderstood Berg's CSRA score.

Instead, we conclude that in assessing Berg's risk of danger, the trial court properly relied on other persuasive factors, such as his criminal history and disciplinary record, which outweighed the suggestion by one single evaluative tool that Berg was at low risk of committing a "super strike" offense.[10] (See *Valencia, supra*, 3 Cal.5th at p. 355, quoting § 1170.18, subd. (b)(3) [in exercising its discretion, trial court may consider " '[a]ny other evidence' " it deems relevant].)

---

[10] We note, for example, that Berg's CDCR Classification score had increased from 84 in 1995 to 204 in 2018, belying Berg's claim that his risk of committing a violent offense would abate with age.

### b. The Court Accurately Concluded That Berg's Rehabilitation and Reentry Plans Were Inadequate.

Lastly, Berg contends the trial court misrepresented his rehabilitation efforts and reentry plans by discounting his long record of employment and his concrete plans for reentry. We disagree, concluding that substantial evidence supports the court's conclusion that Berg's rehabilitation efforts were "sparse" and his reentry plans too "tenuous" to sufficiently eliminate his risk of danger to public safety.

A petitioner's "record of rehabilitation while incarcerated" is a legitimate consideration in assessing his risk of danger to public safety. (§ 1170.18, subd. (b)(2).) Here, the trial court credited Berg's vocational training and record of employment, summarizing his various work assignments from 1991 to 2017 and noting his satisfactory performance. But the trial court was justifiably concerned with Berg's "limited" participation in rehabilitation programs aimed at addressing his particular struggles with substance abuse and anger management during his 23-year incarceration.

The court's concern was well-founded. Berg's criminal history, including his commitment offense, reveals the undeniable relationship between his substance abuse and criminality—Berg committed crimes, even risking injury to others, to support his drug addiction. Indeed, both Subia and Carlson opined that Berg's recovery from substance abuse would be critical to his successful reintegration, and Berg conceded he would need assistance to ensure he did not relapse into a cycle of drug addiction and crime. On this record, the court's conclusion that Berg had not yet reached a point of recovery that would

eliminate his risk of committing a "super strike" was not an abuse of discretion.

Berg also disputes the trial court's representation of his reentry plans as "inadequate," emphasizing his enrollment in the Amity Foundation for "fifteen plus months" and his sister's readiness to support his reentry, as established by the "undisputed record." But Berg's reentry plans were hardly settled. As Subia testified, Berg had not had contact with his sister in four years, had not had visitors in prison since 2001, and listed no emergency contacts in his prison forms. Carlson noted it was "doubtful" Berg could succeed in the community without "substantial support" from resources other than his family members, who were unavailable. Berg's enrollment in the Amity Foundation for "fifteen plus months" did not dispel the court's concern with Berg's long-term sobriety, well-being, and ability to support himself beyond the length of the program. Thus, the court was entitled to conclude that Berg's reentry plans and support network outside of prison were inadequate for his successful reintegration into society.

That Berg disagrees with the court's conclusion, or the weight or lack of weight it accorded to the various factors before it, does not mean the trial court misinterpreted the record or abused its discretion. The trial court was free to consider all relevant evidence and disregard the experts' opinions regarding factors which mitigated Berg's risk of danger. (See *People v. Brown* (2014) 59 Cal.4th 86, 101 [trier of fact is not bound to accept expert opinion or precluded from considering other relevant evidence].)

For all of these reasons, we conclude the court did not abuse its discretion in denying Berg's petition for resentencing under Proposition 47.

## IV. DISPOSITION

The order is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

LAVIN, J.

EGERTON, J.